IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Shirley Fisher, ) | C/A No.: 3:11-1115-MBS-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND RECOMMENDATION |
| ) | |
| Westinghouse Electric Company, LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

In this employment discrimination case, plaintiff Shirley Fisher ("Plaintiff") is suing her former employer, Westinghouse Electric Company, LLC ("Defendant"). Plaintiff alleges the following causes of action: (1) retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); and (2) unlawful interference and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, et. seq ("FMLA").[1] This matter comes before the court on Defendant's motion for summary judgment. [Entry #53]. Plaintiff filed a response to the motion [Entry #59], and Defendant filed a reply [Entry #60]. All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion to dismiss is dispositive, this report and recommendation is entered for the district judge's consideration.

---

[1] Plaintiff previously alleged a race discrimination claim under Title VII and a disability discrimination claim, but withdrew these claims in her response to summary judgment. [Entry #59 at 1].

I.      Factual Background

Plaintiff began working in the medical department of Defendant's Columbia, South Carolina facility in 1996. [Entry #53-2 at 14–16]. She was promoted to second shift full time Health Services Administrator in 1997 and then to Senior Health Services Administrator in 2004. *Id*. at 17–18, 27. Plaintiff regularly received adequate reviews during these years and regularly received raises. *Id*. at 25.

During 2008, Plaintiff was performing drug screens for Defendant. A white female[2] tested positive for an illegal drug. The white Human Resources Manager for the Defendant's Columbia facility, June Kerr, wanted the candidate to be allowed to retake the test at a later date. [Entry #53-2 at 109–110]. The second test was administered at least a week later, and this time, the test was negative. *Id*. Prior to the re-testing of the white female, a black male who had applied for the same position tested positive and was not given the opportunity to be retested. *Id*. According to Plaintiff, Kerr wanted to hire the white employee until Plaintiff complained about "the obvious unlawful disparate treatment." [Entry #59-1 at ¶¶ 3–7].[3]

Additionally, sometime in 2009, Defendant hired a white male intern, despite his

---

[2] Plaintiff refers to this person as an employee, although it appears that the person was a candidate for employment as Plaintiff's declaration indicates "Kerr wanted to hire the white employee until I complained about it." [Entry #59-1 at ¶ 5].

[3] Although Defendant argues that Plaintiff's declaration should not be considered to the extent it conflicts with her deposition testimony, it appears Plaintiff's deposition testimony on this incident is consistent with her declaration. [Entry #53-2 at 110–111]. To the extent Defendant is arguing that Plaintiff did not list this incident as protected activity in her deposition, the record before the court contains only parts of Plaintiff's deposition and is insufficient to evaluate such a claim.

2

drug test being positive for marijuana. [Entry #53-2 at 100–101]. Plaintiff testified in her deposition that she believed Defendant wanted to hire him because of a personal connection with a higher-up employee, but Plaintiff objected to the hire based on the positive drug test. *Id*. At her deposition, Plaintiff did not indicate that her objection to hiring this white intern was based on race-based factors, but only that it was unfair to all other candidates. *Id*. at 102–103.

In 2009, Defendant hired nurse practitioner Stephanie Hollingsworth to manage and help restructure the medical department. [Entry #53-2 at 37–38; Entry #53-3 at 5]. Ms. Hollingsworth was hired because the previous medical department supervisor had no medical background. *Id*. Ms. Hollingsworth's hire was also part of a "Green Belt" project, Defendant's initiative to update and improve the medical department. [Entry #53-2 at 50].

On February 19, 2009, Plaintiff received a reprimand because she failed to timely process an employee's disability paperwork, which caused the employee to lose a week of disability pay. *Id*. at 39–40. Plaintiff admitted she was at fault for the paperwork mistake, but blamed her workload, as Defendant had a high volume of employees out on medical or disability leave. *Id*. Plaintiff's next warning came in May 2009, after she dispensed Pepto-Bismol to a pregnant employee, although Pepto-Bismol is a Category C medication which can cause harmful side effects to the mother and fetus. [Entry #53-5 at 4]. Plaintiff disagreed with the reprimand because she did not personally believe that the medicine would harm the employee or her baby. [Entry #53-2 at 46–48]. Plaintiff was explicitly informed that further problems would lead to discipline up to and including

termination. *Id*. Plaintiff was also reminded of Defendant's open door policy and peer review process as a means of challenging the reprimand, but she did not utilize either. *Id*.

On June 23, 2009, Plaintiff received a performance appraisal for the period between April 2008 and March 2009. [Entry #53-5 at 6–12]. The overall assessment was that Plaintiff did not complete the majority of her objectives for fiscal year 2008. *Id*. Plaintiff admitted that there had been concerns with her unwillingness to adapt to change around this time and with her communication skills. [Entry #53-2 at 52–54].

As a result of this review, Plaintiff was placed on a Performance Improvement Plan ("PIP") on June 30, 2009, which cited the Pepto-Bismol and disability paperwork incidents and outlined seven objectives on which to improve over a 45-day period. [Entry #53-5 at 13–14]. Plaintiff understood that her failure to meet these goals would result in termination. [Entry #53-2 at 58]. Every two weeks during the PIP period, Plaintiff met with Ms. Hollingsworth and Human Resources Representative Sarah Mayle regarding her PIP status. *Id*. at 56–57.  On July 14, 2009, Plaintiff had her first PIP review and failed to achieve an acceptable score in any category. [Entry #53-5 at 15]. Approximately two weeks later, Plaintiff failed to properly process an employee's return from Workers' Compensation leave and received a counseling about the issue. *Id*. at 17. On July 28, 2009, Plaintiff had her second PIP review and was rated acceptable in two of the PIP's seven categories. *Id*. at 18. On August 17, 2009, Plaintiff received another PIP review on which she was rated acceptable in three out of the PIP's seven categories. *Id*. at 19–21. However, by this time, the PIP's 45-day window had expired without Plaintiff reaching her goals.

4

On August 20, 2009, Ms. Kerr and Ms. Hollingsworth met with Plaintiff and informed her that she was being terminated. [Entry #53-2 at 64–66]. During this meeting, Plaintiff told Ms. Kerr that she wanted to keep her job and that she was willing to go to second or third shift in order to do so. *Id.* After Plaintiff's termination, she utilized Defendant's peer review process and challenged her separation. *Id.* at 69. Plaintiff allegedly told the peer review board that she thought Defendant's Human Resources department was doing things she felt were wrong, such as hiring employees with positive drug screens. *Id.* at 69–70. The peer review board decided to reinstate Plaintiff, with her PIP to be revised and reissued for a period of four months, concluding that she should be given a wider window to comply with the PIP's requirements. *Id.* at 71. The peer review board further decided that any failure by Plaintiff to comply with any term or condition of the PIP would result in immediate termination. *Id.* at 72.

Ms. Kerr served as Plaintiff's supervisor because Ms. Hollingsworth resigned when she learned that Plaintiff was reinstated, allegedly because she felt that her nursing license was placed at risk by having Plaintiff in the medical department. *Id.* at 75. Plaintiff's revised PIP progress reports were administered by Ms. Kerr and Ms. Mayle, and Plaintiff successfully completed the PIP in December 2009. [Entry #53-5 at 14, 22]. However, according to Plaintiff's declaration, her white supervisors treated her differently after her reinstatement by questioning her more about leave, requiring her to leave a clock showing when she would return from lunch, and by ceasing non-work

5

communications with her.[4] [Entry #59-1 at ¶¶ 9–11].

Defendant was exploring options to update the Columbia facility's medical department, and around August/September 2009, Defendant's Global Supply Chain Manager, Julie Barr, was brought into the process. [Entry #53-4 at 8–9; #53-6 at 4]. Between January and March 2010, Defendant was considering full outsourcing options as well as hybrid models of internal and external employees. [Entry #53-4 at 8–9]. After Defendant received bids on both a hybrid model and a full outsourcing model, Ms. Barr, Human Resources Consultant April Taylor, and others, including Defendant's Director of Medicine, Dr. William Goldfarb, compiled the data and made a recommendation that the medical department be completely outsourced. *Id*. at 6, 10–11; Entry #53-6 at 5–7. The considerations in the recommendation were to improve the quality of service at the facility, and pricing. [Entry #53-4 at 18–19; #53-6 at 5].

The outsourcing recommendation was given to an executive committee that included Cary Alstadt, the Columbia facility's manager. [Entry #53-4 at 10–11]. In or around May 2010, Mr. Alstadt made the final decision to outsource the medical department, assuming it could be done at a reasonable price. *Id*. at 10–15. Plaintiff was not involved in, and had no knowledge of the decision-making process. [Entry #53-2 at 107]. The undisputed evidence in the record shows that although the decision to outsource had been made in or around May 2010, Defendant continued negotiating the

---

[4] Defendant argues that these allegations are inadmissible because Plaintiff did not divulge them during her deposition. Because the record does not contain a complete copy of Plaintiff's deposition, the undersigned cannot evaluate this argument and assumes without deciding that the allegations are admissible.

specific contract details with its selected third party vendor, Palmetto HealthWorks. [Entry #53-4 at 13–14]. The final Palmetto HealthWorks contract was finished in or around August 2010, with an effective date of October 1, 2010. *Id.* at 12, 15–16. Plaintiff does not challenge the veracity of this evidence. She merely complains that she was not informed of developments as they occurred.

Meanwhile, on July 6, 2010, Plaintiff emailed Ms. Kerr and copied Ms. Taylor, stating that she was having knee surgery on July 15, 2010 and would be out for three or four weeks. [Entry #53-2 at 78; Entry #53-5 at 23]. Prior to this request, Plaintiff had previously taken FMLA leave between five to seven times and had been reinstated after each leave. [Entry #53-2 at 79–82, 98]. As with her past requests, Plaintiff's July 6, 2010, request for FMLA leave was approved. [Entry #53-4 at 17]. Plaintiff also applied for short-term disability benefits and, again, her application was approved. [Entry #53-2 at 86].

In or around early August 2010, while Plaintiff was on leave, she scheduled a carpal tunnel surgery for August 12, 2010. *Id.* at 108. Kerr advised her to get the surgery and return to work when she was completely recuperated. *Id.* at 108–109. In September 2010, while she was still on FMLA leave, Plaintiff went to lunch with Kerr and Taylor. [Entry #59-1 at ¶ 23]. Kerr and Taylor had planned to inform Plaintiff of the outsourcing of the medical department. [Entry #59-2 at 13–14]. However, Plaintiff informed them that her date to return to work would be extended and she would let them know the new date after her upcoming doctor's appointment. *Id.* According to Taylor, because Plaintiff's return date was indefinite, and after consulting with the benefits departments

7

during the lunch, she and Kerr did not inform Plaintiff of the outsourcing. *Id*. Plaintiff alleges that, at the lunch, she asked Kerr and Taylor about rumors of reorganization or outsourcing, but they assured her such rumors were false. [Entry #59-1 at 8]. On September 30, 2010, Plaintiff was informed both in writing and over the phone that her position was being immediately relinquished to Palmetto HealthWorks. [Entry #53-2 at 91; Entry #53-5 at 24–25].

II.     Discussion

   A.     Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

B.	Analysis

1.	Plaintiff's Title VII Claim for Retaliation

To state a prima facie case of Title VII retaliation, Plaintiff must show: (1) that she engaged in a protected activity; (2) that she suffered an adverse employment action at the hands of her employer; and (3) that there existed a causal connection between the protected activity and the adverse action. *Rhoads v. FDIC*, 257 F.3d 373 (4th Cir. 2001); *see also Bryant v. Aiken Reg'l Med. Ctrs.*, 333 F.3d 536 (4th Cir. 2003). Once a plaintiff establishes a prima facie case, "[t]he employer then has the burden to rebut the presumption of retaliation by articulating a legitimate, non-discriminatory reason for its actions." *Rhoads*, 257 F.3d at 392. If the employer does so, the plaintiff must demonstrate that the proffered reason is a pretext for forbidden retaliation. *Id*.

A plaintiff need not have filed a formal complaint with the EEOC or a state deferral agency to engage in protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment, as well as informal complaints, filing of internal grievances, and complaints to an agency, are included within the definition of protected activity. *Warren v. Halstead Indus., Inc.*, 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988); *Mitchell v. Baldridge*, 759 F.2d 80 (D.C. Cir. 1985).

Here, Plaintiff claims she engaged in a protected activity based on "her reporting of the difference in treatment between blacks and whites as far as drug testing was concerned." [Entry #59 at 9]. The court agrees that Plaintiff's 2008 reporting of a white

9

female being allowed to take a second drug test when a black male was denied that opportunity constitutes a protected activity.

However, Plaintiff's 2009 reporting of a white male intern being allowed to take a second drug test does not constitute protected activity, as Plaintiff testified that she believed it was unfair to all other candidates who had failed drug tests, but did not indicate that she believed or complained that it was racially-biased.[5] [Entry #53-2 at 100–103]. Specifically, Plaintiff testified that she believed the intern was being pushed by someone "high up" and that she felt it was unfair to all other candidates who had failed drug tests, which she acknowledged included people of all different races, including whites, African-Americans, and Hispanics. *Id.* at 102–103. Nevertheless, because Plaintiff has shown one instance of protected activity and she suffered an adverse employment decision, she has satisfied the first and second elements of her prima facie case.

Plaintiff has not shown the third element of a prima facie case, that there was a causal connection between the alleged protected activity and the adverse employment action. The protected activity took place in 2008 and Plaintiff's termination was not until

---

[5] Although Plaintiff submitted a declaration with her response brief indicating that she "complained about the racially biased treatment," Defendant argues this is the first allegation that she informed Defendant that she viewed the incident as racially-biased. In fact, such an allegation appears inconsistent with her deposition testimony where she testified that it was unfair to all other candidates, including other whites and African-Americans who had failed drug tests and not been hired. Therefore, the undersigned has not considered paragraphs 6–7 of Plaintiff's declaration. *See Alba v. Merrill Lynch & Co.*, 198 Fed. Appx. 288, 300 (4th Cir. 2006) ("It is well recognized that a plaintiff may not avoid summary judgment by submitting an affidavit that conflicts with earlier deposition testimony.")

September 30, 2010. The lag in time between the protected activity and the adverse employment action negates any inference of causation. *See Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) ("[T]he passage of time tends to negate the inference of discrimination.").

Plaintiff points out that she was placed on a PIP on June 30, 2009 and suggests that this is evidence of further retaliatory animus. *See Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (holding that in cases where temporal proximity between protected activity and alleged retaliatory conduct is missing, courts may look at the intervening period for other evidence of retaliatory animus). However, in the case at hand, more than one year had passed between the protected activity and the alleged intervening retaliatory animus, which again negates an inference of causation. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 278 (4th Cir. 2001) (holding that a six-month lag is sufficient to negate any inference of causation).

Plaintiff also alleges her white supervisors treated her differently after her reinstatement by questioning her more about leave, requiring her to leave a clock showing when she would return from lunch, and by ceasing non-work communications with her. [Entry #59-1 at ¶¶ 9–11]. However, these alleged actions also took place far after her alleged protected activity. As Plaintiff has withdrawn her Title VII race discrimination claim and has not alleged such actions constitute adverse employment actions for her retaliation claim, such allegations are also insufficient to show a causal connection between her 2008 protected activity and her 2010 termination. Therefore, the undersigned recommends Defendant be granted summary judgment on Plaintiff's Title

11

VII retaliation claim.

        2.        FMLA Interference and Retaliation

Plaintiff claims that Defendant retaliated against her for making a claim under the FMLA. The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). To show that Defendant interfered with her FMLA rights, Plaintiff must show that Defendant denied her benefits to which she was entitled. The FMLA "does not protect an employee on leave from an adverse employment decision that would have occurred had she not taken leave." *Thompson v. Spartanburg Cnty.*, C/A No. 06-1248, 2007 WL 2477338, at *9 (D.S.C. Aug. 28, 2007); *see also, Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 978 (8th Cir. 2005) (stating that "the FMLA's plain language and structure dictates that, if an employer were authorized to discharge an employee if the employee were not on FMLA leave, the FMLA does not shield an employee on FMLA leave from the same, lawful discharge"). Therefore, Plaintiff must show that her termination was in retaliation or otherwise unlawful; otherwise, she would not be eligible for FMLA benefits because she was no longer an employee.

To establish a prima facie case of retaliation under the FMLA, Plaintiff must show: (1) she made use of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) that there is a causal connection between Plaintiff's protected activity and the employer's adverse employment action. *See, e.g., Perry v. Computer Sciences Corp.*, 429 F. App'x 218, 220 (4th Cir. 2011). Plaintiff was

12

clealy exercising a protected right under the FMLA and was adversely affected by an employment decision. Additionally, because of the temporal proximity of Plaintiff's exercise of a protected right under FMLA and her termination, i.e, she was terminated during her FMLA leave, Plaintiff has set forth a prima facie case under the FMLA. *See Yashenko v. Harrah's NC Casino Co.*, LLC, 446 F.3d 541, 551 (4th Cir. 2006) ("While evidence as to the closeness in time "'far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.'") (citations omitted).

Therefore, the burden shifts to Defendant to articulate a legitimate, non-retaliatory reason for Plaintiff's discharge. Here, Defendant maintains that Plaintiff was terminated as a result of the decision to outsource the entire medical department. According to Defendant, the decision to outsource was made in May 2010, before Plaintiff exercised her FMLA rights in July 2010, and that Defendant had been considering such an option since 2009. [Entry #59-2 at 10].

Given Defendant's proffer of a non-retaliatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to show that Defendant's reason for termination was pretextual. Here, Plaintiff points to the failure of Taylor and Kerr to inform her of the termination at their lunch in September 2010, during her FMLA leave. Specifically, Plaintiff alleges the testimony of Taylor and Kerr is not credible and unworthy of belief, because they did not tell Plaintiff about the outsourcing at the lunch, despite their original intentions to do so. [Entry #59 at 13]. Taylor and Kerr testified their intentions to tell Plaintiff changed during the lunch because she informed them she was not returning from

FMLA leave as scheduled, thereby obviating the urgency of the news and requiring review of the benefits verbiage due to her ongoing disability. [Entry #59-2 at 13–14; Entry #59-3 at 17].

Plaintiff has not disputed that the decision to outsource was made in May 2010, well before she exercised to right to FMLA leave. Therefore, although Plaintiff may disagree with Defendant's decision to wait to tell her of the outsourcing until September 30, 2010, she has not shown how Defendant's delay demonstrates that its reason for terminating her was pretextual. Plaintiff has not disputed that the decision to outsource, and terminate her employment as a result, was made before this lunch and has set forth no evidence of pretext aside from Defendant's delay in informing her of the outsourcing. Therefore, because she has not met her burden of demonstrating pretext, the undersigned recommends Defendant be granted summary judgment on Plaintiff's FMLA claims. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004) (finding that "[i]f dismissal would have occurred regardless of the request for an FMLA leave, however, an employee may be dismissed even if dismissal prevents her exercise of her right to an FMLA leave"); *see also Dickey v. Carolina Children's Home*, C/A No.: 3:09-867-CMC-PJG, 2010 WL 2571848, *1 (D.S.C. 2010) (finding that employers are not required to reinstate employees on FMLA leave if, for reasons unrelated to their FMLA leave, their positions are no longer available when they are scheduled to return).

III.   Conclusion

For the foregoing reasons, it is recommended that Defendant's motion for summary judgment [Entry #53] be granted and this case be dismissed with prejudice.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

December 3, 2012                                          Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

15

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).