IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Shirley Fisher, | ) | C/A No. 3:11-01115-MBS-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER AND OPINION** |
| | ) | |
| Westinghouse Electric Company LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

On March 22, 2011, Shirley Fisher ("Plaintiff") filed an action in the Court of Common Pleas for Richland County, South Carolina against her employer, Westinghouse Electric Company LLC ("Defendant"). ECF No. 1. Defendant removed the case to district court on May 9, 2011. *Id.* On September 20, 2011, Plaintiff filed an amended complaint asserting claims for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), and the Family and Medical Leave Act, 29 U.S.C. §§ 2601, et seq. ("FMLA").[1] ECF No. 28. Defendant filed an answer on October 4, 2011. ECF No. 29. On March 28, 2012, Defendant filed a motion for summary judgment. ECF No. 53. Plaintiff responded on April 30, 2012, ECF No. 59, and Defendant replied on May 11, 2012. ECF No. 60. In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Shiva V. Hodges for pretrial handling. On December 3, 2012, the Magistrate Judge issued a Report and Recommendation in which she recommended that the court grant Defendant's motion for summary judgment. ECF No. 63. Plaintiff filed objections on December 20, 2012, ECF No. 64, and Defendant replied on January 4, 2013. ECF No. 65.

---

[1] Plaintiff also alleged race discrimination under Title VII and disability discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq., but has since withdrawn those claims.

# I. FACTUAL BACKGROUND

Plaintiff is an African-American female who, in 1996, started working part-time as a registered nurse in the medical department of Defendant's Columbia, South Carolina facility. ECF No. 59-1 at 2. In 1997, Plaintiff started working full-time for Defendant as a health services administrator. *Id.* In 2004, Defendant promoted Plaintiff to senior health services administrator. ECF No. 53-1 at 27.

As a senior health services administrator, Plaintiff was responsible for administering drug tests to applicants for employment. ECF No. 59-1 at 2. At some point in 2008, a female, Caucasian applicant tested positive for illegal drugs. *Id.* Plaintiff testified that a human resources ("HR") manager at Defendant's Columbia facility, June Kerr, a Caucasian, permitted the applicant to retake the drug test. *Id.* at 3. A week later, Plaintiff administered the applicant a second drug test, and the results were negative. *Id.* A male, African-American applicant for the same position failed his drug test and was not provided a second opportunity. According to Plaintiff, "Kerr wanted to hire the [Caucasian applicant] until [Plaintiff] complained about the obvious unlawful disparate treatment based on race." *Id.* at 3. Kerr testified in her deposition that Plaintiff never confronted her with such a complaint.. ECF No. 59-3 at 9.

In early 2009, Defendant hired Stephanie Hollingsworth, a nurse practitioner, to manage and help restructure the medical department. ECF No. 53-2 at 37-38. Defendant hired Hollingsworth as part of the "Green Belt project," which was Defendant's initiative to improve the medical department. *Id.* at 50. On February 19, 2009, Hollingsworth issued Plaintiff a verbal reprimand for her failure to timely process an employee's disability paperwork, which caused the employee to be without pay for a week. ECF No. 53-5 at 3. On May 13, 2009, Hollingsworth

2

issued Plaintiff a written warning for dispensing the drug Pepto-Bismol to a pregnant employee, which drug is known to have harmful side effects for pregnant women. *Id.* at 4. The written warning provided that further misconduct would lead to discipline up to and including termination of employment. *Id.*; ECF No. 53-5 at 5.

In May 2009, a male, Caucasian applicant for an internship position tested positive for illegal drugs, but Defendant hired the applicant after permitting him to retake his drug test, which he passed. ECF No. 53-2 at 100-01. Plaintiff testified in her deposition that she believed Kerr wanted to hire the applicant because of his personal connections to one of Defendant's senior employees. *Id.* Plaintiff testified further that she complained the applicant's treatment was unfair to all other applicants who had not been permitted to retake their drug tests. *Id.* at 102. In her affidavit, Plaintiff testified that she complained to Kerr and Sarah Mayle, a Caucasian HR manager, of "racially biased treatment." ECF No. 59-1 at 3.

On June 23, 2009, Defendant provided Plaintiff a performance appraisal for the period between April 2008 and March 2009. ECF No. 53-5 at 6-12. The appraisal concluded that Plaintiff had failed to satisfy a majority of her performance objectives and competencies. *Id.* Plaintiff received an overall rating of "-P2," which required that she be placed on a performance improvement plan ("PIP"). *Id.* at 11. On June 30, 2009, Defendant issued Plaintiff a PIP that set forth an explanation of the deficiencies in Plaintiff's performance and outlined seven performance objectives for her to achieve within a 45-day period. *Id.* at 13-14. Plaintiff understood, and the PIP provided, that failure to achieve those objectives would result in the termination of her employment. *Id.* at 14; ECF No. 53-2 at 58. Every two weeks during the PIP period, Plaintiff met Hollingsworth and Mayle to review her progress. ECF No. 53-2 at 56-57.

On July 14, 2009, Plaintiff received her first PIP review, which indicated she had failed to achieve an acceptable score on any of the PIP's seven objectives. ECF No. 53-5 at 15. On July 28, 2009, Plaintiff received her second PIP review, which indicated she had achieved an acceptable score on two of the PIP's objectives. *Id.* at 18. Plaintiff's final PIP review, on August 17, 2009, indicated she had achieved an acceptable score on three of the PIP's objectives. *Id.* at 20-21.

On August 20, 2009, after concluding that Plaintiff did not successfully complete the PIP, Kerr and Hollingsworth met with Plaintiff to inform her that Defendant had decided to terminate her employment. ECF No. 53-2 at 64-66. On the same day, Hollingsworth sent Plaintiff a written notice of termination, informing Plaintiff she could challenge the termination decision through the "peer review" process. ECF No. 59-5 at 4. On August 24, 2009, Plaintiff's counsel wrote Mayle a letter stating that Plaintiff believed Defendant terminated her for opposing activity protected under Title VII, and that Plaintiff, with the assistance of counsel, was preparing to file charges of discrimination and retaliation with the Equal Employment Opportunity Commission. ECF No. 59-6 at 3. On August 28, 2009, Plaintiff challenged her termination and sought reinstatement through Defendant's peer review process. ECF No. 53-2 at 69-70. Plaintiff complained to the peer review board that her termination was wrong, and informed the board of HR's practice of hiring employees that had tested positive for drugs. *Id.* at 70. Plaintiff testified that she complained to the peer review board of "the difference in treatment between white and blacks regarding drug testing and [her] belief that it was these complaints" that led to her termination. ECF No. 59-1 at 3. The peer review board decided to reinstate Plaintiff, concluding that the 45-day PIP period did not provide adequate time for Plaintiff to demonstrate

improvement. ECF No. 59-8 at 3. The peer review board requested that the PIP be revised and reissued for a period not to exceed 4 months. ECF No. 53-2 at 71. Defendant reinstated Plaintiff on September 8, 2009, on the condition that failure to comply with any term or condition of the revised PIP would result in immediate termination. *Id.* at 72.

Upon learning of Plaintiff's reinstatement, Hollingsworth resigned because she felt her nursing license would be at risk if she continued to work alongside Plaintiff in Defendant's medical department. ECF Nos. 59-3 at 13 & 53-4 at 5. Thereafter, Kerr served as Plaintiff's supervisor. ECF No. 53-2 at 74-75. Plaintiff testified that after reinstatement her supervisors, all of whom were Caucasian, began treating her differently. ECF No. 59-1 at 4. Plaintiff testified that her supervisors questioned her more extensively when she requested to take time off from work; required that, before taking a break, she post a clock indicating when she would be returning; criticized her in a harsh and unprofessional manner when she suggested new strategies to assist in the performance of her job; and ceased all non-work communications. ECF No. 59-1 at 4. On December 3, 2009, Kerr notified Plaintiff in writing that she had successfully completed the revised PIP. ECF No. 53-5 at 22. Kerr wrote, "Sarah Mayle and I continue to be supportive of your success here at Westinghouse and wish you all the best in you future career endeavors." *Id.*

By late 2009, Kerr and April Taylor, a consultant in HR, began to consider different ways of reforming the medical department, one of which involved outsourcing the entire department to a third-party vendor. ECF Nos. 59-2 at 7 & 59-3 at 13-14. Between January and March 2010, Julie Barr, a global supply chain manager, Dr. William Goldfarb, the director of medicine, and Taylor, began evaluating the merits of a complete-outsourcing versus a hybrid-outsourcing

approach, which Defendant had in place at the time, whereby the medical department was staffed by employees, but a third-party vendor provided medical oversight. ECF No. 53-4 at 8-10. Around this time, Defendant issued "request for proposals" that sought bids from vendors to supply services under both the hybrid and complete outsourcing approaches. *Id.* Barr, Goldfarb, and Taylor analyzed the bids against various criteria, including price, experience, services provided, and quality of service, and recommended to Kerr that the medical department be completely outsourced to a third-party vendor, Palmetto Health Works ("Palmetto"), which at the time was providing Defendant medical oversight. ECF Nos. 53-6 at 5-7 & 53-4 at 8-10. An executive committee reviewed the recommendation and, in May 2010, Cary Alstadt, the Columbia facility plant manager, made the final decision to outsource the entire medical department. ECF No. 53-4 at 12. At the time, the medical department had three employees, including Plaintiff, all of whom were nurses. ECF No. 59-2 at 23. In the months that followed, Defendant negotiated the details of an outsourcing agreement with Palmetto. ECF No. 53-4 at 14. Plaintiff was not involved in the decision-making process or the negotiations with Palmetto, but Plaintiff testified in her deposition that she had heard rumors Defendant was going to "phase out [her] position and bring in contract nurses." ECF No. 53-2 at 88.

On July 6, 2010, Plaintiff e-mailed Kerr and Taylor to inform them that she would be undergoing knee surgery on July 15, 2010, and would be out on medical leave for three to four weeks. ECF Nos. 53-2 at 78 & 53-5 at 23. Defendant approved Plaintiff's request for leave, and HR processed Plaintiff's FMLA paperwork. ECF No. 53-2 at 79. Plaintiff applied for disability benefits during her medical leave, and Defendant approved her application. ECF No. 53-2 at 86. While on medical leave, Plaintiff scheduled carpal tunnel surgery for August 12, 2010. *Id.* at

108. Kerr advised Plaintiff that it would be fine for her to undergo the surgery and that she should return to work after having fully recuperated. *Id.* at 108-09.

Around mid-August 2010, Defendant and Palmetto finalized an outsourcing agreement, which was set to take effect on October 1, 2010. ECF No. 53-4 at 12 & 16. In September 2010, Plaintiff's supervisors, Kerr and Taylor, invited Plaintiff to lunch for the purposes of informing her that Defendant had decided to outsource the medical department and that her termination would take effect on October 1, 2010. ECF No. 59-2 at 13 & 21. Taylor testified in her deposition that she and Kerr decided not to inform Plaintiff of the outsourcing when they learned that Plaintiff intended to extend her medical leave again, as they were concerned that the termination paperwork they had with them that day might require updating if Plaintiff's termination was to take effect while she was on medical leave. ECF No. 59-2 at 15-16. Kerr's testimony does not corroborate Taylor's, nor does it provide a discernible explanation of why, on that day, she and Taylor did not inform Plaintiff of her termination. ECF No. 59-3 at 17-19.

On September 30, 2010, the day before the outsourcing agreement with Palmetto was set to take effect and while Plaintiff was still on medical leave, Defendant informed Plaintiff, by letter and over the phone, of her termination. ECF Nos. 53-2 at 91 & 53-5 at 24-25. The letter Plaintiff received stated:

> As you are aware, Westinghouse began a comprehensive review of the Medical Department at the Columbia, SC facility in December 2009. This review included but was not limited to: the current infrastructure, services provided and needed at the facility, financial cost structure, and all external vendors for supplies and services for our Medical Department. As a result of this review, Westinghouss has made the business decision to no longer staff or manage the Medical Department . . . . Effective October 1, 2010, the staffing and management of Medical will be relinquished to an external vendor.

ECF No. 53-5 at 24. As a severance benefit, Defendant offered Plaintiff $19,000, which she declined to accept. ECF No. 53-2 at 91. Because Plaintiff was the only nurse employed by Defendant on September 30, 2010, Defendant terminated no other nurses on that date. ECF No. 59-2 at 23.

## II. STANDARD OF REVIEW

**A.** *The Magistrate Judge's Report and Recommendation*

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The court is charged with making a de novo determination of any portions of the Report and Recommendation to which a specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

**B.** *Summary Judgment*

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to

return a verdict for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). A party may not create a triable issue of fact at summary judgment by contradicting deposition testimony with a subsequent affidavit. *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999).

### III.  DISCUSSION

**A.**  *Retaliation Under Title VII*

The Magistrate Judge concluded that Plaintiff has failed to make a prima facie showing of retaliation under Title VII. The Magistrate Judge found that Plaintiff engaged in a protected activity when, in 2008, she complained to Kerr that it was unfair to permit a Caucasian job applicant to take a second drug test and not afford an African-American job applicant that same opportunity. ECF No. 63 at 9-10. By contrast, the Magistrate Judge found that Plaintiff did not engage in a protected activity when, in 2009, she reported that a Caucasian internship applicant had been permitted to retake a drug test. *Id.* at 10. To reach that finding, the Magistrate Judge relied on Plaintiff's deposition testimony that she complained Defendant's conduct was unfair to all applicants, but did not credit Plaintiff's contradictory affidavit testimony that she complained of Defendant's "racially biased treatment." *Id.* n.5. Further, the Magistrate Judge found that Plaintiff has not produced sufficient evidence to convince a jury that Plaintiff's protected activity caused her termination. *Id.* In this regard, the Magistrate Judge observed that Plaintiff's protected activity in 2008 was too remote in time from her termination on October 1, 2010, to support a causal connection based on temporal proximity. *Id.* at 10-11. The Magistrate Judge recognized that, in cases where temporal proximity is missing, courts may look to the intervening period between the protected activity and the adverse employment action for evidence of

retaliatory animus. *Id.* (citing *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)). The Magistrate Judge found that the length of time between the first alleged instance of retaliatory animus, the issuance of the PIP on June 30, 2009, and Plaintiff's 2008 protected activity, negates an inference of retaliatory animus. *Id.* Finally, Plaintiff's testimony that her white supervisors treated her poorly after Defendant reinstated her employment on September 8, 2009, the Magistrate Judge found, was insufficient evidence of retaliatory animus to connect Plaintiff's 2008 protected activity to her termination on October 1, 2010. *Id.* Accordingly, the Magistrate Judge recommended that Defendant's motion for summary judgment be granted as to Plaintiff's Title VII claim for retaliation. *Id.*

Plaintiff objects to the Report and Recommendation on several grounds. First, Plaintiff objects to the Magistrate Judge's finding that Plaintiff's 2008 complaint concerning Defendant's disparate treatment of African-American and Caucasian job applicants in the administration of drug tests constitutes protected activity, but Plaintiff's similar complaint in 2009 does not. ECF No. 64 at 2. In this regard, Plaintiff contends that the Magistrate Judge erred by failing to credit her affidavit testimony that, in 2009, she complained to Kerr and Mayle in HR about the preferential treatment a white job applicant received during the drug screening process on account of his race. *Id.* Plaintiff further contends that the Magistrate Judge incorrectly found that Plaintiff's affidavit testimony contradicted her deposition testimony. *Id.* at 2-3. Even if the court decides not to credit her affidavit testimony, Plaintiff contends that, in light of her 2008 complaint, Defendant would have understood that Plaintiff's 2009 complaint concerned racial discrimination. *Id.* at 3.

10

Second, Plaintiff objects to the Magistrate Judge's finding that Plaintiff has not produced sufficient evidence of a causal connection between her protected activity and her termination. *Id.* at 4. Plaintiff contends that, had the Magistrate Judge found that Plaintiff's 2009 complaint constitutes a protected activity, the Magistrate Judge would also have found that the 2009 complaint was causally connected to her termination on October 1, 2010. *Id.* Plaintiff notes that, although her termination occurred more than a year following her 2009 complaint, the record contains evidence of retaliatory animus during the intervening period. *Id.* (citing *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). As evidence, Plaintiff cites the following: that Defendant issued Plaintiff a PIP on June 30, 2009; that Plaintiff was terminated on August 20, 2009, after Hollingsworth, Kerr and Mayle determined she had failed to successfully complete her PIP, which termination was overturned by Defendant's peer review board; that, during her appeal to the peer review board, she informed the board of her earlier complaints regarding racial discrimination in Defendant's drug screening process; and that, upon reinstatement, Plaintiff was treated poorly by her supervisors. *Id.* at 5-6.

Third, Plaintiff objects that, because the Magistrate Judge erred in holding that Plaintiff has failed to make a prima facie showing of retaliation, the Magistrate Judge failed to address her evidence that the explanation Defendant proffered for terminating her employment was pretextual. *Id.* at 6. Plaintiff contends that the delay between the time Defendant decided to outsource its medical department in May 2010, and when it informed Plaintiff of her termination on September 30, 2010, casts doubt on Defendant's motives. *Id.* at 7. As further evidence of pretext, Plaintiff notes that Kerr, to whom she addressed her 2009 complaint, was an early

11

proponent of outsourcing the medical department and that Plaintiff's position was "essentially" the only position that was outsourced as a result of Defendant's decision. *Id.* at 8.

### 1. *Legal Standard*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . . " 42 U.S.C. § 2000e–2(a)(1). A plaintiff can establish claims of discrimination under Title VII in one of two ways, either by directly showing that discrimination motivated the employment decision, or, as is more common, by relying on the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Pursuant to this burden-shifting framework, once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Though intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuasion that the defendant engaged in intentional discrimination remains at all times with the plaintiff. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

Title VII also protects individuals from retaliation by making it unlawful for an employer to discriminate against an employee for opposing an unlawful employment practice or because

the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e–3(a). As with a claim for discrimination, a plaintiff may offer direct evidence of retaliation or use the *McDonnell Douglas* burden-shifting framework. *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006). To demonstrate a prima facie case of retaliation under Title VII, a plaintiff must show: "(1) that she engaged in protected activity; (2) that her employer took an adverse employment action against her; and (3) that a causal connection existed between the protected activity and the asserted adverse action." *See Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997). The final element of the test may be satisfied merely by close temporal proximity between the protected activity and the adverse employment action. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The Fourth Circuit has found that a period of three to four months between the protected activity and the termination was too long to establish a causal connection by temporal proximity alone. *See Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (unpublished). The Fourth Circuit has also found that, "[i]n cases where temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (internal quotation omitted).

*2. Analysis*

After careful review of the record, the court concurs with the Magistrate Judge's recommendation. With respect to the first element of Plaintiff's prima facie case, the court finds that Plaintiff has produced sufficient evidence that her 2008 complaint regarding Defendant's discriminatory administration of the drug screening process constitutes a protected activity, but

that her 2009 complaint regarding Kerr's decision to permit a Caucasian internship applicant to retake a drug test does not constitute one. Plaintiff testified in her deposition that she complained Kerr's 2009 decision was unfair to all the other applicants. ECF No 53-2 at 102. To complain that an employment practice adversely affects all applicants, without suggesting that members of a protected class are disproportionately impacted, is not a charge of discrimination but, rather, unfairness. In this way, Plaintiff's deposition testimony contradicts her affidavit testimony that she complained Defendant's conduct was "racially biased." ECF No. 59-1 at 3. Because a party may not stave off summary judgment by contradicting its deposition testimony with a subsequent affidavit, the court finds that Plaintiff has not produced sufficient evidence to show that her 2009 complaint was a protected activity. *See Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999). Plaintiff also cites evidence in her objections that, when challenging her first termination in August 2009, she informed the peer review board of her earlier complaints concerning discrimination in the administration of the drug screening process.[2] The Magistrate Judge did not address that evidence; however, the court finds that Plaintiff's conduct before the peer review board was a protected activity.

With respect to the second element of Plaintiff's prima facie case, the court finds that Plaintiff's 2008 complaint is too far removed from Plaintiff's termination on October 1, 2010, to support an inference of causation based on temporal proximity. In addition, the court agrees with the Magistrate Judge's finding that the June 30, 2009 PIP is not evidence of retaliatory animus in

---

[2] After careful review of all Plaintiff's submissions, the court finds it difficult to discern whether Plaintiff intends to argue that she engaged in a protected activity when she informed the peer review board of discriminatory practices in Defendant's administration of the drug screening process. Nevertheless, for the purposes of resolving summary judgment, the court construes Plaintiff's submissions as advancing that argument.

14

the intervening period between Plaintiff's protected activity and termination, so as to show that those two events are causally related. The gap of at least seven months between Plaintiff's 2008 complaint and the PIP precludes an inference that Defendant issued the PIP as retaliation. *See Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007); *see also Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) . Moreover, Plaintiff has produced no other evidence to suggest that the issuance of the PIP was retaliatory, rather than the result of Plaintiff's poor performance appraisal for the period between April 2008 and March 2009 and the two reprimands she received in 2009. Because the evidence does not support a finding that the PIP was retaliatory, it is not an event that can link Plaintiff's 2008 complaint to her termination well-over a year later.

However, the court finds that Plaintiff has produced sufficient evidence that a causal connection exists between her conduct before the peer review board in August 2009, and her termination on October 1, 2010. Causality is not supported by temporal proximity but, instead, through evidence of recurring retaliatory animus. According to Plaintiff's testimony, upon reinstatement in September 2009, her supervisors subjected her to harsh criticism; eliminated all personal communications with her; and excessively scrutinized her requests for time off. Moreover, the record is undisputed that, even though Plaintiff was not terminated until October 1, 2010, discussions about outsourcing the medical department started in late 2009/early 2010, around the same time Plaintiff's supervisors began to treat her unfavorably. Although the evidence of causality is not abundant, it is sufficient to sustain Plaintiff's prima facie case of retaliation at the summary judgment stage.

Nevertheless, Plaintiff's claim for retaliation fails as she has not produced sufficient evidence that the legitimate, nonretaliatory explanation Defendant proffered for terminating Plaintiff's employment, that for business reasons Defendant had decided to outsource its medical department, was pretextual. Defendant's evidence shows that, in May 2010, after at least six months of research, discussion, and reviewing bids from potential vendors, Defendant decided that it would be optimal for business to outsource the medical department to Palmetto. Although Kerr was an early proponent of outsourcing the medical department, the evidence shows that several other employees, none of whom are alleged to have had any involvement in Plaintiff's complaints regarding discrimination in the drug screening process, recommended, based on independent analysis, that outsourcing would cut costs and improve the quality of health services at the Columbia facility. Defendant's evidence also shows that Alstadt, Defendant's Columbia facility plant manager, who is also not alleged to have had any involvement in Plaintiff's complaints, made the final decision to outsource the medical department. In response, Plaintiff argues that Defendant's decision to inform Plaintiff of her termination the day before Defendant's outsourcing contract with Palmetto was set to take effect evidences pretext. Although the record does not make clear why Defendant waited until September 30, 2010, to inform Plaintiff of her termination, the court does not find that this action constitutes pretext. In addition the court does not find the fact that Plaintiff was the only employee whose employment was affected by the outsourcing to be evidence of pretext. The evidence is uncontroverted that, when Defendant made the decision to outsource, there were several nurses employed in the medical department. Although Defendant was the only employee who Defendant terminated because of the decision to outsource the medical department, as the other nurses left before the

outsourcing took effect, it is not disputed that the consequence of the decision was to ensure all future nurses working at Defendant's Columbia facility after October 1, 2010, would be contract nurses employed by Palmetto. That multiple positions were affected by Defendant's decision to outsource underscores the court's conclusion that Defendant sought to improve how it provided health services, rather than punish Plaintiff for engaging in a protected activity. For those reasons, the court discerns no evidence of pretext.

Accordingly, Defendant's motion for summary judgement is granted as to Plaintiff's Title VII claim for retaliation.

**B.** *Retaliation Under the FMLA*

The Magistrate Judge concluded that Plaintiff has established a prima facie case of retaliation under the FMLA because Plaintiff has shown she was subject to an adverse employment action, termination, while on FMLA leave. ECF No. 63 at 13. However, the Magistrate Judge found that Plaintiff has failed to produce sufficient evidence to show that the legitimate, non-retaliatory reason that Defendant proffered for terminating Plaintiff's employment was pretextual. *Id.* The Magistrate Judge observed that Defendant's proffered reason was its decision to outsource the entire medical department, a decision which Defendant made in May 2010, before Plaintiff invoked her rights under the FMLA. *Id.* The Magistrate Judge rejected Plaintiff's contention that Defendant's decision to wait until September 30, 2010, the day before the outsourcing agreement with Palmetto was set to take effect, is evidence of pretext. *Id.* In this regard, the Magistrate Judge discerned no evidence of pretext in Taylor's deposition testimony that when she and Kerr went to lunch with Plaintiff in September 2010, they had initially planned to inform Plaintiff of the outsourcing but decided not to when Plaintiff

told them that she intended to extend her medical leave. *Id.* Accordingly, the Magistrate Judge recommended that Defendant's motion for summary judgment be granted as to Plaintiff's claim for retaliation under the FMLA. *Id.* at 14.

Plaintiff objects to the Report and Recommendation, arguing that the Magistrate Judge incorrectly found that Plaintiff has failed to produce sufficient evidence that Defendant's proffered reason for terminating Plaintiffs's employment was pretextual. ECF 64 No. 9. In this regard, Plaintiff's objection is similar to the related argument she puts forth in support of her retaliation claim under Title VII. *Id.* As evidence of pretext, Plaintiff cites the fact that Defendant waited until the day before the outsourcing agreement with Palmetto was set to take effect before informing Plaintiff of her termination. *Id.* Plaintiff also points out that neither Kerr nor Taylor has been able to offer a clear explanation of why, when the three women met for lunch in September 2010, they did not inform Plaintiff that her employment would be terminated as a result of the outsourcing.

**1.  *Legal Standard***

A claim for retaliation under the FMLA is analogous to such a claim under Title VII, and so it is subject to the *McDonnell Douglas* burden-shifting framework. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550-51 (4th Cir. 2006). A prima facie case for retaliation under the FMLA exists where: (1) the plaintiff engaged in a protected activity; (2) the defendant took adverse action against her; and (3) the adverse action was causally connected to the plaintiff's protected activity. *Id.* at 551 (citing *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)).

**2.** *Analysis*

After a careful review of the record, the court concurs with the Magistrate Judge's finding that Plaintiff has failed to produce sufficient evidence that Defendant's proffered, nonretaliatory reason for terminating Plaintiff was pretextual. For the reasons articulated in the court's Title VII analysis, the court discerns no evidence that Defendant's decision, in May 2010, to outsource its medical department was not genuinely motivated by business concerns. Moreover, the timing of the decision to outsource, before Plaintiff invoked her rights under the FMLA in July 2010, precludes a finding that Plaintiff's termination was an act of retaliation.

### III.  CONCLUSION

After a careful review of the record, the court concurs with the Magistrate Judge's findings. The court adopts the Report and Recommendation and incorporates it herein by reference. Defendant's motion for summary judgment is granted and Plaintiff's objections are denied.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour
Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina
March 29, 2013